IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GUILLERMO LOPEZ, SR., | ) | No. CV-F-07-1449 OWW |
| | ) | (No. CR-F-03-5204 OWW) |
| | ) | |
| | ) | MEMORANDUM DECISION AND |
| Petitioner, | ) | ORDER DENYING PETITIONER'S |
| | ) | MOTION TO VACATE, SET ASIDE |
| vs. | ) | OR CORRECT SENTENCE PURSUANT |
| | ) | TO 28 U.S.C. § 2255 IN PART |
| | ) | AND DIRECTING THE UNITED |
| UNITED STATES OF AMERICA, | ) | STATES TO RESPOND IN PART |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

On October 4, 2007, Petitioner Guillermo Lopez, Sr., proceeding in pro per, timely filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.

Petitioner, represented by James Homola, was convicted by jury verdict of conspiracy to manufacture and distribute methamphetamine, manufacture of methamphetamine, and possession of firearms in furtherance of drug trafficking crimes. Petitioner, then represented by Mark McBride, was sentenced to a term of 240 months and a 60 month term of supervised release.

1

1  Petitioner appealed his conviction and sentence to the Ninth

2  Circuit, raising two issues: (1) whether the trial court erred in

3  denying Petitioner's motion to traverse the search warrant; and

4  (2) whether the trial court erred in denying Petitioner's

5  objection to the analysis of evidence by the criminal chemists

6  when the chain of custody had not been adequately established.

7  The Ninth Circuit affirmed. *United States v. Lopez,* 2006 WL

8  2096088 (9th Cir.2006).

9       Petitioner's Section 2255 motion contends that he was denied

10  the effective assistance of counsel on numerous grounds.

11  Petitioner contends that counsel failed to file a motion to

12  suppress, failed to provide an adequate pretrial investigation or

13  to interview or subpoena defense witnesses, failed to move for

14  acquittal pursuant to Rule 29 at the close of the Government's

15  case in chief, failed to object to a constructive amendment of

16  Count 2 of the Indictment, failed to hire a forensic expert to

17  assist the defense, and failed to object to the invalidity of the

18  state search warrants.

19       A.   <u>GOVERNING STANDARDS</u>.

20       To establish an ineffective assistance of counsel claim,

21  Petitioner must show: (1) the representation was deficient,

22  falling "below an objective standard of reasonableness"; and (2)

23  the deficient performance prejudiced the defense. *Strickland v.*

24  *Washington*, 466 U.S. 668, 687 (1984). The Court need not

25  evaluate both prongs of the *Strickland* test if the petitioner

26  fails to establish one or the other. *Strickland*, *id.* at 697;

1  *Thomas v. Borg*, 159 F.3d 1147, 1152 (9th Cir.1998), *cert. denied*,
2  526 U.S. 1055 (1999).

3      Under the first prong, Petitioner must show that "counsel
4  made errors so serious that counsel was not functioning as the
5  'counsel' guaranteed the defendant by the Sixth Amendment."
6  *Strickland*, 466 U.S. at 687.  "A convicted defendant making a
7  claim of ineffective assistance must identify the acts or
8  omissions of counsel that are alleged not to have been the result
9  of reasonable professional judgment."  *Id.* at 690.  "A fair
10  assessment of attorney performance requires that every effort be
11  made to eliminate the distorting effects of hindsight, to
12  reconstruct the circumstances of counsel's challenged conduct,
13  and to evaluate the conduct of counsel's performance at the
14  time."  *Id.* at 689.  The proper inquiry is whether, "in light of
15  all the circumstances, the identified acts or omissions were
16  outside the wide range of professionally competent assistance."
17  *Id.*   The court must apply "a heavy measure of deference to
18  counsel's judgments," and "must indulge a strong presumption that
19  counsel's conduct [fell] within the wide range of reasonable
20  professional assistance."  *Id.* at 690-691.  "The relevant inquiry
21  under *Strickland* is not what defense counsel could have pursued,
22  but rather whether the choices made by defense counsel were
23  reasonable."  *Siripong v. Calderon*, 133 F.3d 732, 736 (9th
24  Cir.1988).  "The failure to raise a meritless legal argument does
25  not constitute ineffective assistance of counsel."  *Shah v.*
26  *United States*, 878 F.2d 1156, 1162 (9th Cir.1989).  A decision to

1   waive an issue where there is little or no likelihood of success

2   and concentrate on other issues is indicative of competence, not

3   ineffectiveness.  *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th

4   Cir.1989).

5       To meet the prejudice requirement, the petitioner must

6   demonstrate that errors "actually had an adverse effect on the

7   defense." *Strickland*, 466 U.S. at 693.  "It is [also] not enough

8   for the defendant to show that the errors had some conceivable

9   effect on the outcome of the proceeding." *Id.*  "Virtually every

10   act or omission of counsel would meet that test, and not every

11   error that conceivably could have influenced the outcome

12   undermines the reliability of the result of the proceeding."  *Id.*

13   "The defendant must show that there is a reasonable probability

14   that, but for counsel's unprofessional errors, the result of the

15   proceeding would have been different.  A reasonable probability

16   is a probability sufficient to undermine confidence in the

17   outcome.  *Id.* at 694.

18      B.  <u>FAILURE TO FILE MOTION TO SUPPRESS</u>.

19       Petitioner contends he was denied the effective assistance

20   of counsel because of counsel's failure to file a motion to

21   suppress evidence.  Petitioner acknowledges that Mr. Homola filed

22   a Motion to Traverse the Search Warrant (Doc. 70), but contends:

23           Whether or not such a motion is the
                equivalent of a <u>MOTION TO SUPPRESS</u>, is

24           immaterial because, even if Counsel's motion
                to Traverse and Quash the Search Warrant, is

25           equivalent to a Motion to Suppress, Counsel
                made the wrong argument for purposes of the

26           Fourth Amendment violation that occurred in

4

1  the case at bar.

2  Mr. Homola filed a Motion to Traverse the Search Warrant and

3  requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154

4  (1978).  The motion was heard on January 20, 2004 and February 4,

5  2004 and denied by oral ruling.  The Court found that, even if

6  certain averments were false, the affidavit to the search warrant

7  was supported by probable cause, a conclusion specifically upheld

8  by the Ninth Circuit.  *See United States v. Lopez*, 2006 WL

9  2096088 (9th Cir.2006).

10  A search warrant was issued on April 22, 2003 by a judge of

11  the Stanislaus County Superior Court for 5824 Santa Fe Avenue,

12  Denair, California for:

13        The black 1989 Chevy pickup, with a cowboy
          seat decal in the rear window and tubular
14        chrome steps and other vehicles with altered
          or missing VIN number, VIN plates, license
15        plates, federal certification labels and car
          parts that would show they were taken from
16        stolen vehicles.  Indicia to include keys,
          utility bills, receipts and letters addressed
17        to the occupants.

18  The search warrant was issued based on the affidavit of Robert

19  Nicholas, Detective of the Turlock Police Department.  Detective

20  Nicholas averred that he had reason to believe that evidence

21  could be found at 5824 Santa Fe Avenue, that will tend to

22  establish violations of California Vehicle Code § 10752(a)[1] and

23  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

24        [1]California Vehicle Code § 10752(a) provides:

25        No person shall, with intent to prejudice,
          damage, injure, or defraud, acquire, possess,
26        sell, or offer for sale any genuine or
          counterfeit    manufacturer's    serial    or

5

California Vehicle Code § 10801.[2]  Detective Nicholas averred:

> On 4/17/03, California Highway Patrol Investigator JOE TYLER told me of a case he has been investigating.  He told me on 03/29/03, he spoke with California Highway Patrol Office J. BUTTICCI who had arrested a subject the night before for driving under the influence.  The subject arrested gave officers the name of GENARO ZASUETA TAPIA. The arresting officers suspected the vehicle identification number plate, located on the left front dash, 1GCGC24K2K3119512, did not belong on or was not issued to the vehicle TAPIA was driving.  The officers noticed the plate was spray painted black and was glued on the dash board rather than having factory rivets.  It appeared the original VIN plate had been removed.  The officers looked at other locations on the pick-up truck where the manufacturer places the VIN but discovered these VIN numbers had been removed.

> On 03/29/03, investigator TYLER reviewed documents for the vehicle.  The documents described the vehicle should be a 1989 Chevrolet pick-up rather than a 2001 Chevy pickup that TAPIA was driving.  It was registered in the name of LOLA LEON at 280 Angelus Drive, Turlock.  Then TYLER completed a VIN edit which confirmed this VIN belonged to a 1989 Chevrolet three-quarter ton

---

> identification  number  from  or  for,  or purporting to be from or for, a vehicle or component part there.

[2]California Vehicle Code § 10801 provides:

> Any person  who  knowingly  and  intentionally owns or operates a chop shop is guilty of a public offense and, upon conviction, shall be punished by imprisonment in the state prison for two, three, or four years, or by a fine of not more than fifty thousand dollars ... or by both the fine and imprisonment, or by up to one year in the county jail, or by a fine of not more than one thousand dollars ... or by both the fine and imprisonment.

6

conventional cab pick-up.  Investigator TYLER then went to Direct Towing and examined the pick-up in which GENARO TAPIA was arrested. Investigator TYLER noticed the VIN plate on the dash had been attached with an adhesive-type substance.  The federal certification label had been removed.  A confidential VIN was located and this vehicle was positively identified as being a 2001 Chevy Silverado half-ton pick-up with a VIN of 1GCEC14VX1Z151787.  This vehicle was reported stolen to Modesto Police Department on 08/14/02, under file #02095199.  This vehicle had not yet been recovered.

On 04/03/03, Investigator TYLER told me LOLA LEON came to the Merced CHP office to gain release of her vehicle from storage.  LEON is the registered owner of the vehicle being driven by GENARO TAPIA at the time of his arrest on 03/28/03.  Investigator TYLER interviewed LEON regarding the pick-up truck in question.  She told Investigator TYLER she had purchased the truck for the sum of $1500 from an unidentified Hispanic male.  LEON then admitted she was not telling the truth. She said she was scared because she had a feeling from the beginning that something was wrong about the truck.  LEON then explained approximately one week earlier her stepson, GENARO LEON TAPIA, had asked her to [undeciperable] and register the pick-up in her name.  PIA told her he had just purchased the truck, and TAPIA did not want the pick-up in his name, because he does not have a drivers license and cannot get insurance.

LEON told Investigator TYLER that TAPIA is also known as GREGORIO LEON.  LEON also said then the time came to go to Department of Motor Vehicles and register the vehicle in her name, TAPIA refused to go with her but told her he would stay at home and to call him if there were any problems.  LEON said she went to the Turlock Department of Motor Vehicles, alone, and completed the registration process without any problems.

Investigator TYLER asked LEON if she ever saw the pick-up she registered in her name.  She said she has seen TAPIA driving the truck.

7

She described the truck as a nice looking silver Chevy pick-up.  LEON did not know if it was a 1989 pick-up but said it was , 'Real nice looking.'  LEON told Investigator Tyler that TAPIA is unemployed but works in the fields when he can find work.  LEON said she wondered where or how TAPIA got the money to buy such a nice truck, because he doesn't have much money.

LEON showed Investigator TYLER where TAPIA lives at 157632 El Capitan in Delhi.  Investigator Tyler attempted to talk with TAPIA, but he was not home.  A message was left with TAPIA's sister-in-law to call him.  LEON said she would also make sure TAPIA contacted Investigator TYLER and was given Investigator TYLER's work phone, cell phone, pager number, and the direct number to his work desk.

On 04/07/03, Investigator TYLER contacted LEON who said she had seen TAPIA twice since they last spoke.  LEON said TAPIA is refusing to cooperate.  TAPIA told LEON he is not going to tell the police who he brought the truck from, because he does not want to get anyone else involved in this matter.

On 04/11/03, Investigator TYLER contacted the victim of the stolen 2001 Chevy truck, RONALD MORA.  MORA told Investigator TYLER the facts and information contained in the report prepared by Modesto Police is accurate and truthful.  He also said he does not know anyone by the names of GENARO TAPIA, or GREGORIO LEON.

On 04/14/03, Investigator TYLER contacted DAVID AYRES in reference to the 1989 Chevy truck that was registered in his name and now registered in the name of LOLA LEON.  This is the vehicle used as the donor vehicle in the VIN switch performed on the stolen 2001 Chevy pick-up.  AYRES said the 1989 Chevy truck was sold on 03/22/03, for $400, to a person named GUILLERMO LOPEZ.  AYRES described LOPEZ as a Hispanic male, approximately 40 to 45 years old, approximately 5'10" tall with a medium build.  AYRES said as part of the deal, he got a flatbed truck bed in trade.  He went to

LOPEZ'S residence at 5824 Santa Fe in Denair and picked up the flatbed.

RAY AYRES went with DAVID AYRES.  RAY described the residence of 5824 Santa Fe as having a large, ornate, brick and wrought iron entrance.  RAY said there was a large house on the property.  The property behind the house was full of cars and trucks.  RAY described the 1989 pick-up sold to LOPEZ as a black Chevrolet, three-quarter ton standard cab pick-up.  He said the pick-up had a blue cowboy decal in the back window, chrome step bars below the doors, fancy wheels and damage to the left side.

On 04/14/03, Investigator TYLER drove to 5824 Santa Fe and from a TID canal bank, he say 25 to 30 vehicles parked to the rear of the main house.  The vehicles were in various stages of disrepair.  He observed four vehicles that appeared to be in good condition; a green Jeep Cherokee, a black Chevrolet pick-up, a Honda Accord, and a silver vehicle make unknown.  Investigator TYLER observed a blue 'cowboy up' decal in the center of the rear window of the black Chevrolet pick-up.  He also observed a chrome tubular step below the right door.  The vehicle matched the description of the 1989 Chevrolet pick-up used to complete the VIN switch on the stolen 2001 Chevy truck.

On 04/14/03, LOLA LEON called Investigator TYLER to arrange a meeting between TAPIA and Investigator TYLER.  Investigator TYLER asked LEON if TAPIA had revealed who had purchased the truck from.  Investigator TYLER said he then heard LEON speaking in Spanish to someone else in her residence.  He heard a male voice responding to LEON.  LEON then told Investigator TYLER that TAPIA had named the person he bought the truck from as a guy named LOPEZ.  LEON said TAPIA told her LOPEZ lives out in the country near Denair.

On 04/22/03, I spoke to Detective JEFF GENEST of the Stanislaus County Auto Theft County Task Force [sic].  He made me aware of a California Highway Patrol case dated 01/29/03, under case #F-140-465-03.  This

9

case involves a person by the name of MILES
GANGLOFF who was issued a citation for
14601.1 C.V.C.  MILES was driving a white
1993 Chevy Lumina.  This vehicle belonged to
a person named TIMOTHY BRADY.  This vehicle
was reported stolen the following day after
the owner realized it was missing.  The 1993
Chevy Lumina had license plates belonging to
GUILLERMO LOPEZ for a 1994 Chevy.  The
registration showed GUILLERMO'S address to be
5824 Santa Fe Avenue in Denair.  As of
January, 2003, MILES GANGLOFF'S drivers [sic]
license record indicates his address as 5824
Santa Fe in Denair.

On 04/22/03, I was informed by Investigator
GARY GUFFEY of the Stanislaus County Auto
Theft Task Force of a case he investigated
under Modesto Police case number 02-129744.
Investigator GUFFEY said on 12/13/02, he went
to Two Tiny Towing in the city of Modesto to
identify a vehicle that was stored at that
facility after being towed as an abandoned
vehicle.  Investigator GUFFEY identified the
vehicle through the confidential VIN since
there were no license plates or public VIN
visible.  The confidential VIN was run and
indicated this as a 1985 Toyota.  The license
plate issued to the Toyota was 3JMN578 [sic].

Department of Motor Vehicles records
indicated the Toyota, license #3JMN587 [sic],
was impounded at another tow company,
American Eagle Towing by the Modesto Police
Department after a traffic stop on 11/18/02.
The owner of the vehicle was DUSTIN SAMONEK.
Investigator GUFFEY went to American Eagle
Towing and identified the second Toyota by
the confidential VIN and determined this
vehicle was a reported stolen vehicle out of
Modesto Police Department.  The license
number issued to this vehicle was a 1987
Toyota with an issued license plate of
2YOV775.  DUSTIN told Investigator GUFFEY he
had just bought the vehicle from his boss,
GUILLERMO LOPEZ.  DUSTIN EXPLAINED he still
owes $900 for the vehicle but is working it
off.  He said LOPEZ owns G & S Construction
and lives between Denair and Hughson.  DUSTIN
denied doing any work or modifications to the
vehicle.

10

Investigator JOE OLIVERA from the Stanislaus County Auto Theft Task Force spoke with GUILLERMO LOPEZ by telephone.  LOPEZ denied knowing DUSTIN SAMONECK or selling him a Toyota van.

Based on information related to me by Investigator TYLER and Investigators GUFFEY and GENEST, reviewing the police reports relating to this case and talking to other auto theft investigators, I know VIN numbers can be used from a legal vehicle to be placed on stolen vehicles.

Investigator TYLER, he told me he discovered a stolen 2001 Chevy pickup [sic] with a VIN belonging to a 1989 Chevy pickup [sic] on it. He spoke to the previous owner fo the 1989 Chevy pickup [sic] who told him he sold the vehicle to GUILLERMO LOPEZ living at 5824 Santa Fe Avenue, Denair.  He described a cowboy sticker on the back window of the pickup [sic] and also described the pickup [sic] as having tubular steps below the doors.  Investigator TYLER saw a vehicle on this property matching that description.

Investigator GUFFEY told me he investigated a stolen vehicle that was at a storage facility in Modesto which had license plates on it that were not issued to it.  He interviewed the driver of this vehicle, DUSTIN SAMONEK, who told him he bought this vehicle from his boss, GUILLERMO LOPEZ who lives between Hughson and Denair.

Detective GENEST told me he investigated a case involving a subject by the name of MILES GANGLOFF who was issued a traffic citation while driving a stolen 1993 Chevy Lumina. This vehicle had license plates on it that belonged to a 1994 Chevrolet registered to GUILLERMO LOPEZ.  MILES GANGLOFF indicated his residence address as the same as GUILLERMO LOPEZ of 5824 Santa Fe Avenue, Denair.

Petitioner nonetheless contends that counsel was ineffective by failing to challenge the affiant's reliance on

11

1  hearsay rather than his own personal knowledge.  This is

2  nonsense.  The information provided to the magistrate provided

3  probable cause to believe stolen and chopped vehicles were being

4  sold and/or stored on Petitioner's property.  Further, "an

5  affidavit may be based on hearsay information and need not

6  reflect the direct personal observations of the affiant, so long

7  as the magistrate is informed on some of the underlying

8  circumstances supporting the affiant's conclusions."  *United*

9  *States v. Ventresca*, 380 U.S. 102, 108 (1965).

10        In *Franks*, the Supreme Court held that the Fourth Amendment

11  entitles a defendant to challenge the veracity of a search

12  warrant affidavit, and that proof of material perjury or reckless

13  disregard for the truth requires exclusion of evidence seized

14  under the warrant.  438 U.S. at 155-156.  As explained in *United*

15  *States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir.1983):

16                  To show entitlement to a *Franks* hearing, the
                defendant must make specific allegations that
17              indicate the portions of the warrant claimed
                to be false ... There must be a contention of
18              deliberate falsehood or reckless disregard
                for the truth ... The allegations must be
19              accompanied by a detailed offer of proof,
                preferably in the form of affidavits ... The
20              offer of proof must challenge the veracity of
                the affiant, not that of his informant ...
21              Finally, the challenged statements in the
                affidavit must be necessary to a finding of
22              probable cause.

23  To be entitled to a *Franks* hearing because of material omissions

24  from an affidavit, the defendant must make a substantial

25  preliminary showing that the affidavit contained a misleading

26  omission, that the omission resulted from a deliberate or

12

reckless disregard of the truth, and that, had there been no omission, the affidavit would have been insufficient to establish probable cause. *United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir.1994). "Not all information in the government's possession need be included in the warrant affidavit ... Only if omitted facts "'cast doubt on the existence of probable cause'" do they rise to the level of misrepresentation." *United States v. Garza*, 980 F.2d 546, 551 (9th Cir.1992).

Here, the failure to move for a *Franks* hearing does not constitute ineffective assistance of counsel. The Court ruled and the Ninth Circuit affirmed that, even without the objectionable averments, the affidavit to the search warrant provided probable cause.

Petitioner's motion on this ground is DENIED.

C.   <u>FAILURE TO MOVE FOR ACQUITTAL PURSUANT TO RULE 29, FEDERAL RULES OF CIVIL PROCEDURE</u>.

Petitioner contends he was denied the effective assistance of counsel because of counsel's failure to move for judgment of acquittal pursuant to Rule 29, Federal Rules of Civil Procedure, at the close of the Government's case-in-chief.

As a general rule, in order to preserve a right to appeal the sufficiency of the evidence, a defendant must move for judgment of acquittal during the trial pursuant to Rule 29(a). *United States v. Ward*, 914 F.2d 1340, 1346 (9th Cir.1990). However, the Ninth Circuit has frequently reviewed waived sufficiency of the evidence arguments, either under the "plain

1   error" standard or observing that the evidence would have been

2   sufficient even if the defendant had properly preserved the

3   objection.  *See United States v. DeGeorge*, 380 F.3d 1203, 1216

4   (9th Cir.2004), citing *United States v. Morfin*, 151 F.3d 1149,

5   1151-1152 (9th Cir.1998); *United States v. Harden*, 846 F.2d 1229,

6   1232 (9th Cir.), *cert. denied*, 488 U.S. 910 (1988).

7        It is arguable that counsel's failure to move for judgment

8   of acquittal at trial satisfies the first prong of the *Strickland*

9   test.  However, Petitioner fails to show satisfy the second prong

10   because he fails to show prejudice.  Petitioner makes no valid

11   showing that the evidence presented at trial was legally

12   insufficient to sustain his conviction and that the Court would

13   have granted a motion for acquittal or that the Ninth Circuit

14   would have reversed Petitioner's conviction on the ground of

15   insufficiency of the evidence.

16        Petitioner argues that his conviction of conspiracy to

17   manufacture and distribute methamphetamine is not supported by

18   sufficient evidence because none of his co-defendants testified

19   at his trial; the only witnesses who testified at the trial for

20   the prosecution were law enforcement officers.  Petitioner cites

21   *United States v. Escobar De Bright*, 742 F.2d 1196, 1198- 199 (9th

22   Cir.1984).  *Escobar De Bright* followed the Fifth Circuit in *Sears

23   v. United States*, 343 F.2d 139 (5th Cir.1965), in holding that

24   there can be no indictable conspiracy with a government informer

25   who secretly intends to frustrate the conspiracy and that there

26   is neither a true agreement nor a meeting of the minds when an

individual conspires to violate the law with only one other person and that person is a government agent.  The fact that law enforcement officers who participated in the search of Petitioner's property, in the post-arrest questioning of Petitioner, and in the analysis of the chemicals and drugs found at Petitioner's property testified as witnesses at trial in no way constitutes a conspiracy between Petitioner and the law enforcement trial witnesses.

Petitioner, again asserting that none of his co-defendants or other co-conspirators were tried or convicted for the conspiracy, argues that the evidence does not support the existence of an agreement between Petitioner and any of his co-defendants or other conspirators to manufacture methamphetamine. Petitioner's contention is without merit.  There was substantial direct and circumstantial evidence presented at trial that others as well as Petitioner were manufacturing methamphetamine on Petitioner's property and residence, and that Petitioner fully was aware of the manufacturing activity and participated in the manufacturing activity.  Petitioner reliance on *Morrison v. California*, 291 U.S. 82 (1934), is unavailing.  In *Morrison,* two men, George Morrison and H. Doi, were convicted of conspiracy to violate California's Alien Land Law, which made it a crime to knowingly conspire to place an alien Japanese, ineligible for citizenship, in the possession and enjoyment of agricultural land within the state.  Because Morrison did not have knowledge that Doi was ineligible for citizenship, the Supreme Court reversed

1   the convictions.  The Supreme Court stated: "It is impossible in

2   the nature of things for a man to conspire with himself ...

3   [C]onspiracy imports a corrupt agreement between not less than

4   two with guilty knowledge on the part of each."  291 U.S. at 92.

5   "Doi was not a conspirator, however guilty his own state of mind,

6   unless Morrison had shared in the guilty knowledge and design."

7   *Id.* at 93.  Here, evidence was presented at trial that other

8   persons on Petitioner's property where the methamphetamine was

9   being manufactured fled at the time of execution of the search

10  warrants, including individuals who worked for him and family

11  members.  This is not a situation such as in *Morrison*.[3]

12      Petitioner's motion on this ground is DENIED.

13      D.  **FAILURE TO OBJECT TO CONSTRUCTIVE AMENDMENT TO COUNT TWO**

14  **OF THE INDICTMENT**.

15      Petitioner contends counsel was ineffective in failing to

16  object to a constructive amendment to Count Two of the

17  Indictment.

18      Count Two charged that Petitioner and his co-defendants,

19  Maria Isabel Lopez, Guillermo Arturo Lopez, Ignacio Gonzalez-

20  Valencia, and Miles Allen Gangloff "on or about April 24, 2003,

21  in the County of Stanislaus, State and Eastern District of

22

23      [3]Petitioner asserts that the Court did not instruct the jury
24  "concerning the Government's Ading [sic] and Abetting theory, that
    is, to prove beyond a reasonable doubt that The Defendant Aided and
    Abetted or otherwise, assisted anyone in the alleged criminal
25  venture of conspiracy to violate the U.S. Drug Laws."  Petitioner
    misrepresents the record.  The jury was given an aiding and
26  abetting instruction (Jury Instruction No. 21).

California, did knowingly and intentionally manufacture 50 grams
or more of methamphetamine, a Schedule II controlled substance,
in violation of Title 21, United States Code, Sections 841(a)(1),
841(b)(1)(B), and Title 18, United States Code, Section 2."

At the close of the evidence but before closing arguments,
the Court, AUSA Servatius, and Mr. Homola discussed jury
instructions.  Ms. Servatius suggested revising the Verdict Form
to make sure that all jurors agreed on which of the firearms that
which had been found in various locations, had been used by
Petitioner in furtherance of the drug trafficking crimes.   The
following discussion then occurred:

> MS. SERVATIUS: A similar problem arises in
> the manufacturing charge since there's
> evidence of what was occurring out in the
> shed and of a separate - the jury could find
> that what was going on on the stove or in the
> crock pot is a manufacture and so I was
> thinking similarly to in the manufacturing
> charge, have them instructed to agree that it
> - although it doesn't make a difference
> statutorily, it will make a difference, I
> think, for sentencing if the Court were to
> find that - if the jury were to find he was
> aiding and abetting the shop, the quantities
> were much higher than, say, what was in the
> house.  And I can similarly segregate out,
> you know, the residence and the shop as two
> separate areas and have them all agree as to
> which one it was.

> THE COURT: We do have authority, it is a
> published decision, it was a case, it was a
> Delano case following *Apprendi* where those
> arguments were made.  And the Court of
> Appeals determined that it was not necessary,
> but if both parties agree, I'm willing to do
> it.

> MR. HOMOLA: I would agree.

1    THE COURT: All right.  I mean, it would be to
     your client's advantage.

2

3    MS. SERVATIUS: My other solution to it was -
     actually this is the preferred solution is to
     tell the jury that that charge only relates

4    to the shop and the evidence in the house
     would only be evidence as to whether or not

5    the defendant knew what was going on in the
     shop.  Because I would - I mean, if the items

6    that were found in the house were so
     insignificant in the course of what we

7    normally do that if the Court were - if the -
     I mean, I would prefer to say that

8    manufacturing activity relates to -

9    THE COURT: The shop.

10   MS. SERVATIUS: - the manufacturing that
     occurred in the shop.

11
     MR. HOMOLA: I agree with that.
12
     MS. SERVATIUS: All right.  I don't see how
13   you couldn't.  And so we will -

14   MS. SERVATIUS: Is that something that perhaps
     I should add in to the manufacturing charge,

15   that the manufacturing charge relates to
     manufacturing activities evidence in the -

16
     THE COURT: You can amend to conform to proof
17   and I can give them instructions which says
     that the manufacturing charge concerns what

18   was found in the trailers or the outbuildings
     and that whatever was found in the residence

19   is simply offered as evidence of knowledge,
     lack of mistake, 404(b) type evidence and

20   give them that limiting instruction.

21   MR. HOMOLA: Thank you.

22   MS. SERVATIUS: That would be agreeable, Your
     Honor.

23
     THE COURT: All right.
24
     MS. SERVATIUS: Is that something the Court
25   will draft?

26   THE COURT: I'll modify these instructions

                          18

accordingly.

(CT, April 7, 2004, 433:1-435:5).   By Jury Instruction No. 18, the Court instructed the jury:

> The defendant is charged in Count 2 of the indictment with manufacturing methamphetamine in violation of section 841(a)(1) of Title 21 of the United States Code.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, the defendant knowingly manufactured methamphetamine; and
>
> Second, the defendant knew that it was methamphetamine.
>
> Additionally, that the crime involved 50 grams or more of methamphetamine.
>
> *The charge of manufacturing methamphetamine concerns the activities alleged to have been conducted in shop building* [sic].  *As to the manufacture of a controlled substance count, controlled substance evidence seized in the residence may be considered by you only as it bears on the Defendant's opportunity, intent, preparation, knowledge, absence of mistake or accident and for no other purpose.*

[Emphasis added].

Petitioner argues that the inclusion in Jury Instruction No. 18 that "[t]he charge of manufacturing methamphetamine concerns the activities alleged to have been conducted in shop building," constitutes a constructive amendment of Count Two of the Indictment.  He contends that Mr. Homola was ineffective by failing to object to the constructive amendment and that Mr. McBride, his appellate counsel, was ineffective by failing to raise this issue on appeal.

19

The Fifth Amendment guarantees a criminal defendant "[t]he right to stand trial only on charges made by a grand jury in its indictment." *United States v. Garcia-Paz*, 282 F.3d 1212, 1215 (9th Cir.2002).  After an indictment has been returned and criminal proceedings are underway, the indictment's charges may not be broadened by amendment, either literal or constructive, except by the grand jury itself.  *Stirone v. United States*, 361 U.S. 212, 215-216 (1960).  As explained in *United States v. Adamson*, 291 F.3d 606, 614-615 (9th Cir.2002):

> 'An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them.' ... A variance on the other hand, 'occurs when ... the evidence offered at trial proves facts materially different from those alleged in the indictment.' ....

> The line between a constructive amendment and a variance is at times difficult to draw ... Nevertheless, the line is significant because, whereas a constructive amendment always requires reversal, 'a variance requires reversal only if it prejudices a defendant's substantial rights.' ....

> In our efforts to draw this line, we have found constructive amendment of an indictment where (1) 'there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument,' or (2) 'the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.' ... *see also Dipentino*, 242 F.3d at 1094-95 (finding constructive amendment where indictment charged defendants with allowing scraped asbestos-containing materials to dry out on floor, instead of placing materials, while

wet, into leak proof containers, but jury
instruction permitted jury to convict
defendants for failing to deposit asbestos
containing materials as soon as possible at
waste disposal site meeting appropriate
federal requirements); *United States v.
Carlson*, 616 F.2d 446, 447-48 (9th Cir.1980)
(finding constructive amendment where
indictment charged defendant with misapplying
bank funds by causing loan to be made for
personal use, but evidence and instructions
permitted conviction for misapplying bank
funds by causing loan to be made knowing that
it was inadequately secured); *Howard v.
Dagget*, 526 F.2d 1388 (9th Cir.1975) (finding
constructive amendment where indictment
charged defendant with inducing two named
women to engage in prostitution but evidence
and instructions allowed jury to convict
defendant of inducing women neither named nor
mentioned in the indictment).

Although a constructive amendment usually
involves a complex of facts, we have
generally found a variance where the
indictment and the proof involve only a
single, though materially different, set of
facts. *See Van Stoll*, 726 F.2d at 586
(finding nonfatal variance where indictment
charged defendant with 'transporting in
interstate commerce $10,000 that was taken by
fraud from Ron McCallum' but proof and
instructions allowed jury to convict
defendant of taking $10,000 from McCallum's
business partner); *United States v.
Tsinhnahijinnie*, 112 F.3d 988, 990-92 (9th
Cir.1997) (finding fatal variance where
indictment charged defendant with sexual
abuse of child occurring on Indian
reservation during summer of 1992, but proof
fluctuated between placing the abuse at place
and time in indictment and placing it off
reservation in 1994); *Olson*, 925 F.2d at
1174-75 (finding nonfatal variance in mail
fraud prosecution, where indictment charged
'a scheme to defraud and to obtain money' but
jury instructions required proof that
defendants schemed to defraud by obtaining
'money or property'); *Jeffers v. United
States*, 392 F.2d 749, 752-53 (9th Cir.1968)
(finding fatal variance where indictment

> alleged that money solicited by religious
> group was used for non-religious purposes,
> but evidence failed to prove that use was
> non-religious, instead showing that use was
> merely contrary to representations made when
> money was collected.

The limitation in Jury Instruction No. 18 of the manufacturing of methamphetamine charge to the evidence of manufacturing in the shop building on the property does not constitute a constructive amendment to Count Two of the Indictment.  There was no complex of facts presented at the trial distinctly different from those alleged in Count Two, nor was the crime of manufacturing methamphetamine as charged in Count Two substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.  Because Jury Instruction No. 18 did not constructively amend Count Two of the Indictment, neither trial counsel nor appellate counsel were constitutionally ineffective in failing to object or raise this ground on appeal.

Petitioner further asserts ineffective assistance of counsel because Mr. Homola "agreed with the Court's erroneous Sua Sponte inclusion of the 404(b) type evidence, or Other Crimes Evidence." Petitioner contends:

> [T]he District Court's Sua Sponte
> impermissible inclusion of the 404(b) (other
> crimes evidence) complained of, was akin to a
> Directed Verdict for the Government, at
> least, for sentencing purposes, and, said
> impermissible inclusion served to separate
> Counts One & Two in one instance for one
> purpose but then, the Court proceeded to
> instruct the Jury on Count Two as follows:

'... the charge in Count Two is manufacturing methamphetamine.  You may find the defendant guilty of the charge, manufacturing methamphetamine, if the government has proved each of the following elements beyond a reasonable doubt: First, <u>another person committed the crime as alleged in that count; the person was a member of the conspiracy charged in Count One of the indictment; the person committed the crime in furtherance of the conspiracy; and that the defendant was a member of the same conspiracy at the same time as the offense charged in Count Two was committed; and the offense falls within the scope of the unlawful agreement ....</u>'

Petitioner's contentions are without merit.  Evidence pertaining to controlled substances found in the residence was properly admitted at trial.  The limitation of consideration by the jury this evidence only to Petitioner's opportunity, intent, preparation, knowledge, absence of mistake or accident in the manufacturing of methamphetamine conducted in the shop building was appropriate under the Federal Rules of Evidence.  Petitioner's assertion that the limiting instruction in Jury Instruction No. 18 constituted a directed verdict for the Government is baseless.  The limitation of the jury's consideration of controlled substances evidence found in the residence solely to the issue of Petitioner's opportunity, intent, preparation, knowledge, absence of mistake or accident in the manufacturing of methamphetamine conducted in the shop building does not in any way constitute a directed verdict; to

23

1   the contrary, it limited Petitioner's potential liability.

2   Petitioner's contention that Jury Instruction No. 20, the

3   *Pinkerton* charge, establishes that Counts One and Two were the

4   same offense and that counsel was ineffective in failing to

5   object to Jury Instruction No. 20, also is without merit.  The

6   *Pinkerton* doctrine is a judicially-created rule that makes a

7   conspirator criminally liable for the substantive offenses

8   committed by a co-conspirator when they are reasonably

9   foreseeable and committed in furtherance of the conspiracy.

10   *Pinkerton v. United States*, 328 U.S. 640, 645-648 (1946); *United*

11   *States v. Long*, 301 F.3d 1095, 1103 (9th Cir.2002), *cert. denied*,

12   537 U.S. 1216 (2003).  The conspiracy charged in Count One and

13   the manufacturing charged in Count Two are separate offenses.

14   *See   United States v. Wylie*, 625 F.2d 1371, 1381 (9th Cir.1980),

15   *cert. denied*, 449 U.S. 1080 (1981).

16   Petitioner's motion on these grounds is DENIED.

17   E.   <u>Failure to Hire Forensic Chemist</u>.

18   Petitioner contends he was denied the effective assistance

19   of counsel because of counsel's failure to retain a forensic

20   chemist for trial or for sentencing.  Petitioner asserts:

21   The Government witnesses' that was used as
     experts, named many different chemicals that
22   was allegedly found during the search by the
     arresting officers that was related to the
23   methamphetamine, such as <u>PSEUDOEPHEDRINE</u>,
     <u>TOLUNET XYLENE</u>, <u>DIMETHYLSUFONE</u>, <u>d-</u>
24   <u>PSEUDOEPEDRINE</u>, <u>RED PHOSPHOROUS</u>, <u>DENATURED</u>
     <u>ALCOHOL</u> (etc).

25

26   The calculations of the drug quantity by the
     Government's expert witnesses while using the

> above named chemicals, are erroneous, and was
> based solely upon innuendos, speculations and
> assumptions.  The Government's expert
> witnesses were not qualified in forensic
> chemistry, and, the Government failed to
> prove beyond a reasonable doubt that the
> chemicals found to be involved, had been used
> to produce methamphetamine.
>
> Had Counsel obtained a qualified forensic
> expert for the defense, he/she could have
> provided an impressive scientific explanation
> of PRECURSOR CHEMICALS THEORETICAL YIELDS and
> the dramatic difference between the above
> listed chemicals, of which, was never
> professionally done by the Government's
> forensic chemist.

Petitioner is not entitled to relief on this ground because

he has not demonstrated the prejudice prong of the *Strickland*

test.  Petitioner has not identified a forensic chemist who would

have provided the testimony described by Petitioner.  *See Wildman*

*v. Johnson*, 261 F.3d 832, 839 (9th Cir.2001)("[Petitioner]

offered no evidence that an ... expert would have testified on

his behalf at trial.  He merely speculates that such an expert

could be found.  Such speculation, however, is insufficient to

establish prejudice.").[4]

Petitioner's motion on this ground is DENIED.

F.   FAILURE TO INVESTIGATE AND SUBPOENA WITNESSES.

Petitioner contends that he was denied the effective

assistance of counsel because of counsel's failure to interview

---

[4]Petitioner further notes that Rule 16(a)(1)(C), Federal Rules
of Criminal Procedure, and *Brady v. Maryland*, 373 U.S. 83 (1963),
require the Government to disclose tangible objects to the defense
for inspection.  Petitioner makes no showing that this was not done
in his criminal case.

25

and subpoena as defense witnesses Martinez Angezes Porfilio,
Garcia Jasso Jose Alaerdo, and Ivan Ramirez, Evaristo Madrigal,
Miles Gangloff, and Ignacio Valencia.

Petitioner asserts that Martinez Angezes Porfilio, Garcia
Jasso Jose Alaerdo, and Ivan Ramirez were ready to testify that
Petitioner had no knowledge about methamphetamine being
manufactured on his property.  Petitioner asserts that these
potential witnesses "were all drug users, and they knew that The
Defendant had no knowledge of any drug related activity allegedly
taking place in the trailers and the shop building where they
hung out together on the property every day."  Petitioner
contends:

> AFTER, the Government interviewed the above
> named potential witnesses, while they were
> under arrest, and learned that they were not
> going to implicate The Defendant in their
> very own manufacturing of methamphetamine,
> for their own personal or for their friends
> and associates drug abuses, or otherwise, The
> Government had them Deported Back to Mexico,
> in violations of The Defendant's Sixth
> Amendment right to compulsory process.
>
> However, the above named potential witnesses,
> immediately returned, (in less than one
> month), back to the United States.  Upon
> their return to the United States, they all,
> immediately, made contact with some of The
> Defendant's family members, and informed them
> that they was willing to talk with The
> Defendant's lawyer and have him to take sworn
> depositions or affidavits, after which, they
> were ready to come to Court and give truthful
> credible testimony on behalf of The Defendant
> and make clear to the Court that The
> Defendant had no knowledge if their was any
> manufacturing of methamphetamine on any of
> the property outside his residence.

> They were not concerned about getting
> deported again because they said that could
> come right back across the Border anytime
> they wanted to, just like they always do.

Petitioner contends that he requested defense counsel to subpoena

these potential witnesses on his behalf and that counsel lied to

Petitioner when he told Petitioner he was going to interview them

and subpoena them to testify at trial.

With regard to Evaristo Madrigal, Petitioner contends that

"he lived in the shop building which he shared with some of his

friends," that, after Petitioner was arrested, Madrigal

> went to The Defendant's family and told them
> that he was prepared to go to The Defendant's
> trial and testify that The Defendant had no
> knowledge of whether or not there was any
> manufacturing of methamphetamine taking place
> in any of the trailers or the shop building.

> Madrigal told The Defendant's family members
> to have The Defendant's lawyer to give him a
> date for a meeting for and interview because
> he wanted to testify at The Defendant's
> trial.  Counsel told The Defendant that he
> was ... going to interview Madrigal and that
> he was going to subpoena him for the purpose
> of testifying at trial, but, Counsel failed
> to keep his word ....

As to Miles Gangloff and Ignacio Valencia, Petitioner makes

no assertion that he asked defense counsel to subpoena these

individuals, both of whom were co-defendants of Petitioner's and

both of whom pleaded guilty.

Petitioner has not demonstrated that Mr. Homola's alleged

failure to interview and/or subpoena any of these witnesses

constituted ineffective assistance of counsel.  Petitioner has

not provided affidavits from any of these individuals that they

would have testified on Petitioner's behalf and what they would
have testified to.  *See Dows v. Woods*, 211 F.3d 480, 486 (9th
Cir.), *cert. denied*, 531 U.S. 908 (2000)(rejecting ineffective
assistance claim for failure to call alibi witness when there was
no evidence in the record that the witness existed other than
petitioner's self-serving affidavit and petitioner did not
present an affidavit from this alleged witness that he would have
provided helpful testimony).

Furthermore, the evidence in the criminal case established
that Petitioner was fully aware that methamphetamine was being
manufactured on his property.  A methamphetamine laboratory was
found in the garage to Petitioner's residence, including barrels
of chemicals used in the manufacture of methamphetamine, a
quarter-pound of methamphetamine in finished form, and other
items consistent with the manufacture of methamphetamine, such as
one-gallon alcohol cans and a Pyrex cake dish containing a liquid
chemical associated with the manufacture of methamphetamine.  A
crock pot was found in the kitchen of Petitioner's residence,
which contained a dark liquid emitting an intense chemical odor.
Next to the crock pot was a coffee filter which contained
methamphetamine in a crystalline state and a cup which contained
methamphetamine in liquid form.  In Petitioner's jacket three
bags of methamphetamine packaged for sale were found, and three
receipts from The Home Depot dated April 23, 2003 for purchases
of denatured alcohol, a chemical commonly used in the manufacture
of methamphetamine.  Cooking pans and glass cake dishes

associated with the manufacture of methamphetamine were found in
Petitioner's master bedroom and bath.   Other items associated
with the use and manufacture of methamphetamine and
methamphetamine were found in the master bedroom closet and
dresser.   Eighteen firearms were found in the residence.
Additional items associated with the manufacture of
methamphetamine were found inside one of the trailers located on
Petitioner's property, including one pound of red phosphorous and
approximately one pound of iodine.   The keys to the trailer were
found in the residence.   After Petitioner was arrested, he made
statements that the property belonged to him and that he was
responsible for the drugs and firearms found in the residence,
although he denied that the methamphetamine was his.   He stated
that he had rented the garage to an individual named Pedro,
although he did not know Pedro's last name.   When Pedro stopped
paying rent, Petitioner stated that he kicked him out.   When
questioned about the chemicals found in the kitchen, bedroom and
back porch, Petitioner stated that he was trying to clean the
place up.   Petitioner admitted that one of the containers found
in the kitchen had been in the garage and stated that he brought
the container inside because someone had told him that, if he
heated it up, it would turn into crystal methamphetamine.
Petitioner denied being a drug dealer and stated that there would
be money in the residence if he was a drug dealer.   Petitioner
denied being involved in the manufacture of methamphetamine
despite all of the items found in the residence, stating that he

1   was attempting to clean out the garage.  Petitioner displayed

2   signs of being under the influence of a stimulant.  Petitioner

3   stated that he smoked five grams of methamphetamine per day and

4   that he purchased methamphetamine on the streets from someone he

5   did not know.  Prior to being transported to the jail, agents

6   found a plastic bag containing methamphetamine in Petitioner's

7   pants pocket.

8       Although Petitioner denied being aware that methamphetamine

9   was being manufactured in the trailers or the garage, the

10  evidence of manufacturing found in the residence and the garage,

11  including The Home Depot receipts found in Petitioner's jacket

12  and the keys to the trailer being found in the residence

13  establishes that the alleged failure to subpoena any of these

14  witnesses, even assuming that they would be willing to waive

15  their Fifth Amendment rights and testify on Petitioner's behalf,

16  does not satisfy the prejudice prong of the *Strickland* test.

17  Petitioner has not shown a reasonable probability that, but for

18  Mr. Homola's alleged failure to interview and subpoena these

19  witnesses for trial, the result of the criminal trial would have

20  been different.

21      Petitioner's motion on this ground is DENIED.

22      G.  <u>Failure to Challenge Procedural Invalidity of State</u>

23  <u>Search Warrant</u>.

24      Petitioner claims he was denied the effective assistance of

25  defense counsel by his failure to investigate "whether or not,

26  there existed any authentic search warrants or any authentic

criminal complaints issued by the State of California to search

The Defendant's property/residence on April 22, and April 24,

2003, ... and whether or not such documents were issued by the

Honorable Judge Linda McFadden of the Juvenile Court of

Stanislaus County, in Modesto, California." Petitioner asserts

that he told defense counsel that Detective Nicholas refused to

give a copy of the search warrant to Petitioner during the search

of his residence on April 24, 2003 and that Petitioner was

charged on April 28, 2003 by the Stanislaus County District

Attorney's Office with controlled substance and firearms charges

under the California Penal Code.   Petitioner contends:

> When Detective Nocholas [sic] entered The
> Defendant residence on April 24, 2003, he
> told The Defendant that he had a search
> warrant to search his property and his
> residence ... The Defendant asked Detective
> Nicholas to show him the warrant, he told The
> Defendant to sit down on the sofa, however,
> The Defendant again, asked Detective Nicholas
> to let him see his search warrant, then,
> Detective Nicholas became irriated [sic] and
> he handcuffed The Defendant and he then
> pushed The Defendant down onto the sofa, but,
> The Defendant still persisted with his
> request of Detective Nicholas to show him his
> search warrant, at that time, Detective
> Nicholas told The Defendant that he didn't
> need to show him a search warrant and that he
> was the police and that he can do whatever he
> wanted to do, he them told The Defendant to
> sit down and be quite [sic] and don't ask him
> anything about a search warrant anymore, and,
> he told The Defendant that I will show you
> the search warrant when I'am [sic] ready to.

> Subquently [sic], on April 28, 2003, The
> Defendant was charged by the State of
> California's District Attorney's Office, by
> Prosecutor Archibald with controlled
> substance and firearm charges under the

1          California Code Sections ....

2          The Defendant's first Court appearance in
           Stanislaus County Criminal Court, was made on
3          April 28, 2003, before the Honorable Criminal
           Court Judge Nancy Ashley ... When Prosecutor
4          Archibald presented his case to the Court,
           the Honorable Judge Nancy Ashley became
5          highly upset with Prosecutor Archibald for
           failing to present to the Court any authentic
6          criminal complaints, or any authentic
           affidavits in support thereof, or any
7          authentic search warrants, authorizing a
           search of The Defendant's property/residence,
8          however, reluctantly, The Honorable Judge
           Nancy Ashley gave Prosecutor Archibald until
9          May 3, 2003 to produce the criminal
           complaints and the sworn affidavits in
10         support thereof and the search warrants that
           was allegedly issued by The Honorable Judge
11         Linda McFadden on April 22 ....

12         On May 5th, 2003, the Court ordered another
           Court appearance date for, May 12, 2003.  A
13         few days later, The Defendant's state lawyer,
           (Attorney McAllister), told The Defendant
14         that the alleged Criminal Complaint and the
           Sworn Affidavit in support thereof, is not on
15         file in The Honorable Judge Linda McFadden's
           Court and the alleged sworn affidavits and
16         the search warrants that was provided to him
           by the California State Attorney's Office,
17         was not stamped filed by the Court, and did
           not have a case number on them, and, they
18         were not authentic, as such, they would not
           be filed into The Honorable Judge Nancy
19         Ashley's Court, and therefore, the charges
           against The Defendant would be dismissed by
20         the Court.

21         Just like The Defendant's State Lawyer
           (McAllister) told him The Defendant's State
22         Court date was moved up to May 8, 2003, and
           the charges against him was dismissed ...
23         Counsel told the Defendant that there was not
           going to be any trial because Prosecutor
24         Archibald did not have the non-existent,
           Criminal Complaint, nor a Sworn Affidavit in
25         support thereof, nor did he have any search
           warrant.

26

                              32

Exhibit G to the Petitioner's motion is a copy of the minute order issued by the Stanislaus County Superior Court stating that the state action was dismissed "to be federally prosecuted."

Attached to the motion to suppress filed in this action is a copy of the affidavit in support of the search warrant executed and signed by Detective Robert Nicholas and subscribed and sworn to Judge McFadden on April 22, 2003 at 4:45 p.m.  This search warrant authorized the search of Petitioner's property for "[t]he black 1989 Chevy pickup, with a cowboy decal in the rear window and tubular chrome steps and any other vehicles with altered or missing VIN numbers, VIN plates, license plates, federal certification labels and car parts that would show they were taken from stolen vehicles.  Indicia to include keys, utility bills, receipts, and letters addressed to the occupants."  The affidavit is signed by Detective Nicholas and was sworn before Judge McFadden on April 22, 2003 at 4:45 p.m.  Also attached to the motion to suppress is a copy of the search warrant which is also signed by Judge McFadden on April 22, 2003 at 4:45 p.m. The return to the search warrant is signed by Detective Nocholas on April 28, 2003.  However, the attached order permitting the evidence described in the return to be delivered to the custody of Turlock Police Services is not signed by a judge of the Stanislaus County Courts.  Nonetheless, the record establishes that the April 22, 2003 search warrant was issued by Judge McFadden.  To the extent Petitioner's motion asserts ineffective assistance of counsel by failing to challenge the April 22, 2003

33

search warrant on the ground that it was fictitious and never issued by a state court judge, Petitioner's claim is without merit.

According to the Affidavit of AUSA Servatius in support of the criminal complaint filed in this action, members of the Stanislaus County Auto Theft Task Force (STANCAT) advised members of the Modesto HIDTA Task Force, the Stanislaus Drug Enforcement Agency, and Special Agent Sumner of the DEA that STANCAT had observed chemicals and equipment consistent with use in making methamphetamine while executing the April 22, 2003 search warrant on April 24, 2003, of Petitioner's residence and property in connection with STANCAT's ongoing auto theft investigation.  Ms. Servatius avers that a second search warrant was then obtained for the drug-related evidence on April 24, 2003 and the second search occurred on that day.  The second search warrant was not challenged by Petitioner on any grounds other than that it was the fruit of the allegedly illegal first search.  No challenge was made that the second search warrant was never issued by a state court judge.  At the hearing on October 21, 2005 in connection with Petitioner's motion to suppress the first search warrant, Petitioner attempted to provide a handwritten document to the Court:

> THE COURT: All right.  Well, Mr. Lopez, I
> think, has another document that he wishes
> for you to see.

> THE DEFENDANT: (In English) For you, your
> Honor.  This is for you, your Honor, this
> document.

1          THE COURT: All right -

2          THE DEFENDANT: It's an explanation where that
3          - (In Spanish) where the agents arrived at
           5:20 in the afternoon to my house -

4          MR. HOMOLA: Your Honor, I would ask that -

5          THE DEFENDANT:  - without a search warrant.
           Okay, your Honor, so I have the search
6          warrant that they did come up with three
           hours after the search was done.  And it is
7          not signed, your Honor.  I have it here, if
           you would like to look at it.  And I also
8          have the one that was signed two days before.
           The 24th of April, at 5:20 in the afternoon,
9          the officers arrived at my home without a
           search warrant.  At the moment that they
10         entered our home, they handcuffed us, they
           had guns drawn, and I asked them for a search
11         warrant.  They told me they didn't need a
           search warrant.
12
           So three hours later, at 10:30 at nighttime,
13         after they had searched throughout my home,
           they brought in a search warrant without
14         signature, and I do have that search warrant
           with me.
15
           After a month later, when we were brought
16         here, a search warrant appears, the same one,
           that is signed and it is dated April 22nd.
17         My attorney, Mr. Homola, he says that that's
           legal to do that ... [¶] I showed this to Mr.
18         Capozzi at first also, when he was my
           attorney, and all he did was scratch his head
19         and say that what they did was legal.

20   (CT 5:11-6:25).  The Court ordered Petitioner to provide a copy

21   of his written statement to Mr. Homola for his review and

22   investigation and continued the hearing on the motion to

23   suppress, giving the parties the opportunity to file supplemental

24   briefs if Mr. Homola believed that Petitioner's statement raised

25   additional grounds for suppression.  Petitioner's statement, Doc.

26   94 in the official file, states:

                                   35

> [O]n the 24 of April appox. At 5:20 pm
> without any reason and without an order or a
> search warrant they entered and violating our
> rights ... The agents of the Police
> Department Turlock and Modesto after
> violating our legal rights at about 9:30 or
> 10:00 pm at night ... they brought me a
> search warrant without a signature of a judge
> and we got this order of the search warrant
> without the signature.

No supplemental briefs were filed.

Petitioner's claim that there was no search warrant authorizing the search of his property for evidence of methamphetamine manufacturing and that counsel was ineffective by failing to challenge the second search of his property on this ground cannot be resolved summarily.  The United States is directed to file a response to Petitioner's claim.

<u>CONCLUSION</u>:

For the reasons stated:

1.  Petitioner's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 is DENIED IN PART in every respect, except as to the second search warrant issue;

2.  The United States is ordered to file a response to Petitioner's claim that no search warrant was issued for the search of his residence and property for evidence of methamphetamine manufacturing on April 24, 2003.  The United States' response shall be filed within 30 days of the filing date of this Memorandum Decision and Order.  Petitioner's reply, if any, shall be filed within 30 days thereafter.  All further proceedings shall be by order of the Court.

1   IT IS SO ORDERED.

2   **Dated:     June 8, 2009     **                    **/s/ Oliver W. Wanger**
                                              UNITED STATES DISTRICT JUDGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26